### UNITED STATES v. KADISON et al.
### No. 8487.

Circuit Court of Appeals, Seventh Circuit.

Nov. 15, 1944.

526

Ira M. Holmes, of Indianapolis, Ind., and Joseph R. Roach, of Chicago, Ill., for appellants.

B. Howard Caughran, U. S. Atty., and Paul A. Pfister, Asst. U. S. Atty., both of Indianapolis, Ind., for appellee.

Before MAJOR, KERNER, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

Arthur H. Wyatt, Jacob Unger, Herman Kadison, Aubrey A. Shulman, and Bernard Franklin were indicted in the Southern District of Indiana on charges of using the United States mails in a scheme to defraud in violation of section 215 of the Criminal Code, 18 U.S.C.A. § 338, and of conspiring to commit the substantive offense in violation of section 37 of the Criminal Code, 18 U.S.C.A. § 88.

A trial was had before a jury. Unger was not present and was therefore not tried. At the conclusion of all the evidence, defendants Kadison and Franklin moved for a directed verdict on the ground that the evidence was not sufficient to support the allegations of the indictment. The court took the motions under advisement and allowed the case to go to the jury. Shulman was acquitted, Wyatt was found guilty on all counts, and Kadison and Franklin were found guilty only on one of the substantive counts. The court then overruled the pending motions of Kadison and Franklin for a directed verdict. It set aside the conviction of Wyatt on the conspiracy count, but otherwise entered judgment on the verdict. From this judgment Kadison and Franklin appeal.

■■■ On this appeal we are asked to consider the admissibility of certain evidence and the correctness of the court's instructions to the jury. No objection was made below on these grounds. These issues are presented here for the first time, but we are urged to consider them and to overlook the fact that they were not raised at the trial. True, we may consider on appeal errors not urged below if the errors are "obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings." United States v. Atkinson, 297 U.S. 157, 160; 56 S.Ct. 391, 392, 80 L.Ed. 555. No such showing has been made on this record. The alleged errors are far from obvious. The defendants were represented by distinguished representatives at the Indianapolis bar, who accepted the court's ample, correct, and fair instructions without suggestion or exception. No objections were urged as to the admissibility of any evidence. Upon such a record we consider only whether there was error in overruling the defendants' motion for a directed verdict. In other words, we consider the sufficiency of the evidence to support the verdict.

■■■ In considering the sufficiency of the evidence, we do not sit as triers of fact, but only as reviewers of the record for errors of law. If there is some evidence, though meagre and based upon conflicting testimony, which is responsive to the allegations of the indictment and is sufficient to sustain the verdict, it is our duty on review to uphold the verdict. Stilson v. United States, 250 U.S. 583, 40 S.Ct. 28, 63 L.Ed. 1154; Reuben v. United States, 7 Cir., 86 F.2d 464; Ayervais v. United States, 3 Cir., 72 F.2d 720.

The indictment charged that the defendants had devised a scheme for the sale of the worthless stock of Commercial Underwriters, Inc., upon representations that the stock was treasury stock of the corporation and that the money received from the sale was to go into the treasury of Commercial Underwriters, Inc., to be used in establishing sales agencies for a related insurance company in which most of the prospective purchasers of the worthless stock were stockholders, while in truth the offered stock was the personal stock of Wyatt, Kadison, Franklin, and other individuals and they received the proceeds from these sales. It was charged that the defendants had represented to prospective purchasers that there was a shortage of this stock and that the available shares which they were offering were some which had been turned back by some investor who had been unable to carry out his contract of purchase, while in truth there were large blocks of

the stock available for sale in the hands of Kadison, Franklin, Wyatt, and Wyatt's friends. The indictment further charged that in carrying out this scheme to sell worthless stock to the public the defendants had used the United States mail.

The evidence may be briefly summarized as follows: Arthur Wyatt was the promoter of the Commercial Indemnity Insurance Company, herein called the Insurance company. He was also the organizer of the Commercial Underwriters, Inc., hereinafter called Underwriters. Wyatt had two contracts with the Insurance company, one to sell its capital stock at a commission of 15%, and another contract to act as its exclusive insurance sales agent at a commission of 10% of all premiums collected in Indiana and 5% of those collected outside the state. This latter contract could be assigned by Wyatt to any corporation in which he owned at least 25% of the stock. Accordingly Wyatt assigned the agency contract to Underwriters in exchange for all of that corporation's authorized capital, which was 2,000 shares of no-par common stock. Wyatt then caused the capital of Underwriters to be increased to 2,500 shares so that the 500 share increase might be validated for public sale at $100 per share by the Indiana Securities Commission.

Wyatt advertised in a Chicago newspaper for salesmen, and the appellants Kadison and Franklin, both residents of Chicago, responded to the ad. Both were hired by Wyatt as salesmen and began to sell the stock of the Insurance company, for which they received 10% commission, Wyatt retaining the other 5%. Then they were given the 500 shares of validated and unissued Underwriters' stock to sell. Wyatt gave to Kadison and Franklin 50 shares each of his own Underwriters' stock in order to induce the two to remain with him as salesmen. Later, Wyatt gave to each of these two defendants eighteen additional shares of the Underwriters' stock in satisfaction of commissions which he owed them.

Wyatt gave to other prominent citizens of Indiana, whose reputations he thought might be of some benefit to the Insurance company, some stock in Underwriters out of the 2,000 shares which he had caused to be issued to himself, leaving a balance of 674 shares in his name. None of the 2,000

shares had been validated, but Wyatt had obtained a legal opinion that these unvalidated shares could be sold without the authorization of the Securities Commission of Indiana. Wyatt, Kadison, and Franklin then conceived the idea of selling their shares in Underwriters to the public at $100 a share, although they all knew that Underwriters was practically insolvent and that its stock was nearly worthless.

With this knowledge, Kadison and Franklin sold their own stock and that of Wyatt and his friends to the general public upon representations that it was the treasury stock of Underwriters and that the proceeds were going into the treasury of Underwriters as working capital to establish an agency organization for the Insurance company and to support the Insurance company in its infancy. The Insurance company was the chief source of the Underwriters' revenue, and the persons to whom Underwriters' stock was sold were, for the most part, stockholders in the Insurance company and anxious to see it prosper. In making these sales of the unvalidated stock of Underwriters, Kadison and Franklin represented that the only shares available were those that someone had turned back either because the purchaser had died, or for some other reason had failed to complete the transaction, when in fact they knew that it was their own stock and the stock of Wyatt and his friends from which the orders could and would be filled. They said that they themselves would like to be able to own some of this stock, but that they were only poor salesmen who could not afford it. The purchasers of the stock believed that they were buying the treasury stock of Underwriters and testified that they would not have bought the stock if they had known the true facts. The proof of the use of the mails was ample.

■ It can be seen that there is some evidence which, if believed by the jury, would be sufficient to support the verdict. We, of course, do not undertake to weigh this evidence, to pass upon its truth, to resolve the conflicts in the testimony, or to pass upon the credibility of the witnesses. Those things are within the province of the jury. Accordingly, since we believe that this evidence is sufficient to support the verdict, the judgment of the District Court is affirmed.